IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHANH THONG,

   Plaintiff,

vs.              No.  02cv0927 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

   Defendant.

## MEMORANDUM OPINION

   This matter is before the Court on Plaintiff's (Thong's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 14]**, filed March 6, 2003.  The Commissioner of Social Security issued a final decision denying Thong's application for disability insurance benefits and supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse and remand is well taken and will be GRANTED.

## I.  Factual and Procedural Background

   Thong filed his current application for disability insurance benefits and supplemental security income benefits on January 4, 2000, alleging disability since January 31, 1997, due to the residual effects of amputation below the right knee, a back injury and problems with his legs.  Tr. 14.  Thong received a limited education in Laos and has past relevant work as a plastic assembly line inspector for a plastic company.  On March 7, 2002, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Thong had a severe combination of physical impairments, including the residual effects of a right below knee amputation and right carpal

tunnel syndrome. *Id.* However, the ALJ found Thong's severe impairments did not "meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." *Id.* Specifically, the ALJ reviewed Listings 1.05 Amputation (due to any cause) and 1.02B (Involvement of one major peripheral joint in each upper extremity (wrist-hand).). Tr. 15-19. The ALJ also found Thong retained the residual functional capacity (RFC) "to perform work within the light and sedentary exertional levels." Tr. 21. As to his credibility, the ALJ found Thong "was not a fully credible witness, and the statements regarding the functional effects of his condition [were] not fully accurate." Tr. 20. Thong filed a Request for Review of the decision by the Appeals Council. On July 12, 2002, the Appeals Council denied Thong's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Thong seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.  20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past.  20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience. *Id.*

 In support of his motion to reverse, Thong makes the following arguments: (1) the ALJ's

finding that he could perform overhead reaching or fine or gross manipulation is not supported by

substantial evidence and is contrary to law; (2) the ALJ's finding that he could perform his past

relevant work is not supported by substantial evidence and is contrary to law; (3) the ALJ's

finding that he could perform the jobs of semi-conductor loader and jewelry preparer is not

supported by substantial evidence and is contrary to law; and (4) the ALJ's credibility

determination is not supported by substantial evidence and is contrary to law.

## A.  Thong's Medical History

 Thong, a Laotian,  reported stepping on a land mine as a child while in Laos.  Tr. 174.

This resulted in amputation below the knee of his right leg.  He has required a prosthesis since

that time.  Over time his stump has become fairly sore, often breaking down.  Thong has a long

work history as a machine operator in a plastics factory from 1981 through 1995.  Tr. 125-126.

Apparently, Thong resided in a refugee camp until he came to the United States in 1980.  *See*

*Thong v. Halter*, CIV No. 99-1485 JP/KBM,  March 28, 2001 Proposed Findings and

Recommended Disposition at 2.  Thong reported his job entailed inspecting plastic parts on a

conveyor belt and removing the defective ones.  Thong would then pack the required number of

plastic parts in a box.  He would then affix a label to the box.  Tr. 38-40, 62, 144.  He testified he

had to stop working because of increasing problems with pain of his right leg, problems with his

prosthesis and numbness of both arms.  Tr. 43-46.  Thong alleges he became disabled around January 31, 1997.  Treatment for these problems are well documented.  The following is a summary of Thong's medical care at University Hospital.

Thong was evaluated at University Hospital for back and leg pain on November 15, 1996. Tr. 279, 258.  At that time, Thong complained of right leg and hip pain of several years duration and complained it had recently gotten worse with walking.  Thong described the pain as a burning sensation and reported involvement of his left shoulder.  Thong complained that his left shoulder was numb when he awoke and  progressively got better throughout the day with residual numbness of his 4th and 5th digits of his left hand.  *Id.*

The physical examination revealed some restriction of movement of the left shoulder with lateral abduction, decreased sensation in the ulnar area, the strength of his hand grasp was weaker on the left side, and his left arm reflex was weaker on the left arm.  *Id.*  The physician ordered lab work and x-rays of his right leg, left shoulder and lumbosacral area.  *Id.*  The physician prescribed Ibuprofen 600 mg three times a day and Norflex (muscle relaxant) 100 mg twice a day. The physician also instructed Thong to return for a follow-up visit in two weeks.  A translator assisted the physician with this evaluation.

Due to Thong's inability to communicate in English, he left the hospital before the lab work was drawn and the x-rays scheduled.  On November 18, 1996, someone from University hospital called Thong and informed him he had to schedule his x-rays and set up his follow-up appointment.  Tr. 277.

On December 2, 1996, Thong returned for his follow-up examination.  Tr. 276, 256.  The physician noted Thong had misunderstood his instructions at the previous appointment.  Thong

reported increased pain with his prosthesis.  The physician focused on Thong's right leg pain and reordered lab work and x-rays of his right hip and knee.  Tr. 276.  Thong's shoulder problem was not brought up by Thong or the physician.  Consequently, no x-rays of the left shoulder were ordered at this visit. The physician instructed Thong to return for a follow-up in two weeks.  A translator also assisted the physician with this evaluation.

On December 17, 1996, Thong returned for his follow-up.  Tr. 275, 255.  Thong reported he still had hip pain.  The physician assessed Thong's hip pain as "musculoskeletal" and advised him to continue with the Ibuprofen.  The physician had not yet reviewed the x-ray films but instructed Thong to return in two months.  *Id.*  However, a report dated December 9, 1996, indicated the x-ray results revealed Thong had an "[e]ssentially unremarkable examination of the pelvis and right hip."  Tr. 233.

On July 21, 1997, Thong returned to University Hospital with complaints of "burning pain" of the right knee.  Tr. 272, 253, 232.  The physician diagnosed Thong with infection of the right knee and prescribed antibiotics.  The physician referred Thong to the orthopedic clinic and to the physical therapy department.  *Id.*  The physician instructed Thong to return in two days.  A translator assisted the physician with this evaluation.

On July 23, 1997, Thong returned for his follow-up.  Tr. 271, 252.  He was diagnosed with knee cellulitis and instructed to continue the antibiotics.  He was instructed to return for a follow-up in two weeks.  Id.

On August 6, 1997, Thong returned for his follow-up.  Tr. 270, 251. The physician noted Thong's cellulitis had improved and recommended hot soaks.

6

On August 11, 1997, Dr. Worrell, an orthopedist, examined Thong and found Thong had a soft tissue tumor on the posterior aspect of his right below knee amputation.  Tr. 231.  Dr. Worrell referred Thong to the University Hospital Cancer Center for excision and treatment.  *Id.,* Tr. 230.

On August 13, 1997, Dr. Worrell scheduled Thong for excision of the tumor and revision of the right below knee amputation stump for August 15, 1997.  Tr. 226.

On August 15, 1997, Dr. Worrell removed Thong's tumor.  The pathology report indicated no malignancy.  Tr. 224.  Dr. Worrell instructed Thong to return for suture removal in one week.  Tr. 221.

On August 27, 1997, Thong returned for his follow-up with Dr. Worrell.  Tr. 219.  Dr. Worrell removed the sutures and advised Thong to maintain stump shrinkage with appropriate elastic wrapping.  Dr. Worrell instructed Thong to return for follow-up in two weeks.

On September 10, 1997, Dr. Worrell reported Thong had minimal discomfort, was able to use his artificial limb without any difficulty, and had a satisfactory gait.  Tr. 218.  Dr. Worrell referred Thong to the amputee clinic for further care.

On July 22, 1998, Dr. Worrell examined Thong for complaints of chronic right hip pain.  Tr. 217.  Dr. Worrell suspected it was related to his gait pattern because his amputation stump was in excellent condition and his right below knee prosthesis was in very good condition.  Dr. Worrell indicated he would like to follow Thong in the amputee clinic.

On October 12, 1998, Dr. Worrell evaluated Thong for low back pain.  Tr. 216.  Dr. Worrell recommended Ibuprofen for the discomfort.

On April 12, 1999, Dr. Worrell examined Thong for right hip pain.  Tr. 215.  Dr. Worrell opined Thong needed a new prosthesis because the stump was touching the bottom of the socket.

On February 11, 2000, Dr. Eugene Toner performed a consultative examination.  Tr. 174-179.  Dr. Toner reviewed the University Hospital records.  Tr. 175.  On examination, Dr. Toner found Thong had pain to his upper back when he moved his shoulders and moved them very slowly.  Tr. 175, 179.  Dr. Toner opined  Thong "should not be walking or standing for more than six hours at a time" and "lifting more than 40 pounds might be somewhat difficult for him."  Tr. 176.  Dr. Toner further opined he would "restrict his walking or use of his upper extremities as far as overhead lifting, fine manipulation or handling of materials was concerned."  *Id.*

On February 15, 2000, Dr. Barbara Abercrombie completed a Physical RFC assessment form.  Tr. 180-187.  Dr. Abercrombie is the agency's non-examining consultant.  Dr. Abercrombie found Thong could occasionally lift 50 pounds, frequently lift 25 pounds, and stand and/or walk for a total of about six hours in an eight-hour workday.  Tr. 181.  However, Dr. Abercrombie found Thong had limited ability to reach overhead in all directions.  Tr. 183.  Dr. Abercrombie also noted the consulting physician had suggested restricting Thong's overhead reaching and fine manipulation. Tr. 186.  Dr. Abecrombie noted there was no evidence Thong had a problem with fine manipulation, but overhead manipulation was limited due to pain.  *Id.*

On April 19, 2000, Dr. Pitcher, an orthopedic oncologist, evaluated Thong at Dr. Worrell's request.  Tr. 212.  Dr. Worrell referred Thong to Dr. Pitcher because he continued to experience pain and had another mass in the right popliteal fossa (right posterior knee).  Dr. Pitcher's diagnosis was "suppurative (forming pus) inflammation with focal necrosis."  *Id.*  Dr.

Pitcher found Thong's mass affected his gait.  Dr. Pitcher recommended another excisional biopsy with a culture for tuberculosis.

On April 28, 2000, Dr. Pitcher excised the right posterior leg mass and sent specimens to the pathology lab for aerobic and anerobic AFB and fungal cultures.  Tr. 208.  The pathology report indicated the biopsy was negative for fungi and TB.  Tr. 210, 211.

On May 3, 2000, Thong returned for his postoperative visit.  Tr. 207.  Dr. Pitcher noted the wound was healing well and applied another bulky dressing.  Dr. Pitcher also noted no cultures had grown.  Dr. Pitcher instructed Thong to return in one week.  On this same day, Dr. Pitcher wrote a "To Whom it May Concern" letter, detailing Thong's limitations.  Specifically, Dr. Pitcher indicated Thong was limited in his walking, climbing, bending, stooping, and crawling activities, as well as lifting.  Tr. 190, 317.  Dr. Pitcher opined that these activities be limited to his own tolerance because of the precarious nature of using a prosthesis and performing these activities.  Tr. 317.

On May 10, 2000, Dr. Pitcher removed Thong's sutures and noted the wound was healing nicely. Tr. 206.  Dr. Pitcher advised Thong not to wear the prosthesis for another week and to return in two weeks.

On May 24, 2000, Dr. Pitcher examined Thong and noted the wound was completely healed.  Tr. 205.  Thong wore his prosthesis that day.  Dr. Pitcher instructed Thong to return on an as-needed basis.

On June 14, 2000, Thong returned to see Dr. Pitcher because of some drainage from the wound.  Tr. 202.  On examination, Dr. Pitcher noted some swelling superior to the incision.  Dr. Pitcher prescribed a course of antibiotics and instructed Thong to return in two weeks.

9

On June 28, 2000, Dr. Pitcher examined Thong and found the wound was completely healed.  Tr. 201, 200.  Dr. Pitcher recommended Thong complete the course of antibiotics and return in one month.

On February 5, 2001, Ms. Deborah Weissman, PAC (Certified Physician Assistant) evaluated Thong for complaints of right leg pain.  Tr. 269, 250.  At that time, Thong also reported feeling sad, having nightmares, and being scared.  Ms. Weissman prescribed Zoloft 100 mg. ½ tablet every day, along with Ibuprofen 800 mg three times a day for the pain.  *Id.*  Ms. Weissman also scheduled EMG's for February 20, 2001, to address Thong's complaint of right hand pain.  *Id.*

On March 16, 2001, Thong returned to see Ms. Weissman.  Tr. 268, 249, 244.  Thong complained of leg pain when he sat too long and when he walked too much.  Thong also complained of right arm pain. The February 20, 2001 EMG indicated "[t]here was clear evidence of a right carpal tunnel syndrome with an increased distal motor latency, as well as an increased lumbrical interosseous differential between the median and ulnar nerves.  An increased lumbrical interosseous differential confirmed there was a distally placed right median problem."  Tr. 266, 245, 283, 323.   Ms. Weissman ordered a right wrist splint for his right carpal tunnel syndrome and referred him to the pain clinic.  Ms. Weissman instructed Thong to return in six to eight weeks or as needed.  A translator assisted Ms. Weissman with this evaluation.

On March 21, 2001, Dr. Pitcher completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)" form.  Tr. 280-283.  Dr. Pitcher limited Thong to occasionally lifting and/or carrying 15 pounds, standing and/or walking for four hours a day (two hours without interruption), and opined Thong should never climb, crouch, or crawl due to his below

10

knee amputation.  Tr. 280-281.  Dr. Pitcher also opined Thong was limited in his ability to

push/pull due to his amputation.  Tr. 282.  Finally, Dr. Pitcher opined Thong "should be limited in

dangerous activities such as with heights or with machinery."  *Id.*

On August 20, 2001, Ms. Weissman wrote a "To Whom it May Concern" letter,

indicating Thong had increasing stump pain of a chronic nature that made working extremely

uncomfortable and painful for him.  Tr. 321.

**B.  Thong's Ability to Perform Overhead Reaching and Fine and Gross Manipulation**

In his decision, the ALJ found Thong could perform work within the light and sedentary

exertional levels.  Tr. 21.  This finding is not supported by substantial evidence.  On March 21,

2001, Dr. David Pitcher completed a Medical Assessment of Ability to do Work-Related

Activities (Physical) form.  Relying on Dr. Pitcher's assessment, the ALJ found:

> With respect to exertional limitations, I am persuaded the claimant retains the capacity to
> perform work within the light and sedentary exertional levels of work as outlined in
> [Dr.Pitcher's assessment], despite the claimant's physical impairments.  In reaching this
> conclusion, I have accepted as credible that his lifting and carrying, standing and walking
> capacity would be reduced commensurate with pain associated with the amputation of his
> right leg below the knee, his stump complications and related gait abnormality.  <u>I do not
> accept the presence of any limitation upon the claimant's fine and gross manipulative
> ability.  Nor do I find any basis to restrict the claimant from overhead reaching as
> suggested by the consultative examiner in his report of February 2000.</u>

Tr. 21(emphasis added).  The ALJ rejected "any limitation" as to Thong's fine and gross

manipulative ability.  However, on February 20, 2001, an EMG performed at University Hospital

indicated "clear evidence of a right carpal tunnel syndrome . . . ."[1]  Tr. 283.  Thong's health care

---

[1] Carpal tunnel syndrome is caused by compression of the median nerve as it passes
through the carpal tunnel in the wrist.  Activities or jobs that require repetitive flexion and
extension of the wrist may pose an occupational risk.  Symptoms include pain of the hand and
wrist associated with tingling and numbness, classically distributed along the median nerve (the
palmar side of the palm, the index and middle fingers, and the radial half of the ring finger.

provider, Ms. Deborah Weissman, PAC (Certified Physician Assistant), prescribed a right wrist splint for his right carpal tunnel syndrome and referred him to the pain clinic.  Tr. 268.  In his January 19, 2000 Physical Daily Activities Questionnaire, Thong reported "I go arms numb" in response to why he could not engage in many activities.  Tr. 160.  He also reported "can't write letter fingers go numb."  Tr. 163.  Thong's counsel's secretary assisted him in completing this form.  And, with the assistance of an interpreter, Thong testified as follows at the administrative hearing:

> ALJ:   Do you have any problems with your grip or with your hands?
>
> Ans:   Sometimes, yeah.
>
> ALJ:   What happens?  Tell me.
>
> Ans:   Get numb.
>
> ALJ:   They get numb?
>
> Ans:   Get numb, yes.
>
> ALJ:   Are you able to hold on to things?
>
> Ans:   When they get numb, I cannot feel.
>
> ALJ:   Is one hand worse than the other?
>
> Ans:   But this one, I cannot answer because the doctor, too many times I go see a doctor like that.
>
> ALJ:   This one is the right?
>
> Ans:   Yeah, the right hand. Then (inaudible) to writing.

---

Typically the patient wakes at night with burning or aching pain and with numbness and tingling. Treatment includes a lightweight wrist splint, especially at night and analgesics. *The Merck Manual* 491 (17th ed. 1999).

ALJ:    Uh-huh.  It gets numb on you?

Ans:    Yes.

Tr. 50-51.

The ALJ also found no basis to restrict Thong from overhead reaching.  However, on November 15, 1996, Thong complained, among other things, of left shoulder pain and described it as a burning sensation.  Tr. 279, 258.  Thong complained that his left shoulder was numb when he awoke and  progressively got better throughout the day with residual numbness of his 4th and 5th digits of his left hand.  *Id.*  The physical examination revealed some restriction of movement of the left shoulder with lateral abduction, decreased sensation in the ulnar area, the strength of his hand grasp was weaker on the left side, and his left arm reflex was weaker on the left arm.  *Id.*  The physician ordered x-ray's of his left shoulder.  The record indicates Thong misunderstood the physician's instructions and left before scheduling of the x-rays.  At his next visit, it appears that the physician focused on Thong's problems associated with his right below-knee amputation and never addressed the shoulder problem.

It was not until February 11, 2000, when Dr. Toner performed the consultative examination, that this problem was uncovered.  Tr. 174-179.  On examination, Dr. Toner found Thong had pain to his upper back when he moved his shoulders and moved them very slowly.  Tr. 175, 179.  Dr. Toner restricted Thong's "use of his upper extremities as far as overhead lifting, fine manipulation or handling of materials is concerned."  Tr. 176.  The Court notes Dr. Toner indicated in his report that "[Thong] put out good effort here and I find no evidence of any symptom magnification."  *Id.*

13

Additionally, in his January 19, 2000 Physical Daily Activities Questionnaire, Thong also indicated his back hurt and "felt numb all over."  159.  Thong also reported he could put his groceries in the kitchen cabinets but had to do it "slowly."  Tr. 162.  At the October 19, 2001 administrative hearing, Thong testified "When I lift, you know, with my arms, sometimes if I do it too much, it feels numb.  All the times that this does that.  Also, when I work too much, even with my arms or move it too much and I go, at night time, when I lay down, it really aches me."  Tr. 45-46.

The ALJ gave Dr. Pitcher's opinion controlling weight because he was a specialist in orthopedics and had treated Thong "for the most recent difficulty with his stump beginning in about April 2000."  Tr. 21.  Specifically, the ALJ stated, "I have afforded Dr. Pitcher's opinions regarding the claimant's functional abilities controlling weight given his area of expertise, as well as his longitudinal relationship with the claimant."  *Id.*  Dr. Worrell, Thong's regular orthopedist, referred Thong to Dr. Pitcher to evaluate a mass in his right posterior knee.  The Court notes that the record indicates "Orthopedic Oncology" under Dr. Pitcher's name.  Tr. 190.  Dr. Worrell, on the other hand, is a Professor and Vice Chairman of the Department of Orthopedics.  Dr. Pitcher removed the mass.  Dr. Pitcher saw Thong five more times postoperatively.  Once the wound healed, Dr. Pitcher referred him back to his regular health care provider.  There is no evidence that Dr. Pitcher evaluated Thong for anything else other than the mass in his right posterior knee.

The ALJ rejected Dr. Toner's evaluation but gave no explanation for doing so.  Dr. Toner, at the request of the agency, reviewed the medical records from University Hospital and performed a thorough physical examination.  Based on his findings, Dr. Toner opined Thong's "use of his upper extremities as far as overhead lifting" be restricted.  The evidence supports Dr.

14

Toner's conclusion.  Dr. Toner's specialty is Occupational Medicine.  The opinions of specialist related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved.  *See* 20 C.F.R. § 404.1527(d)(2).  Dr. Toner's opinion, as a specialist in, among other things, evaluating and determining an individual's ability to work, was entitled to more weight than the oncologist who treated Thong for one isolated problem.

Moreover, On February 15, 2000, Dr. Abercrombie, the agency's nonexamining medical consultant, reviewed Thong's medical records and completed a Physical RFC Assessment form. Tr. 180-186.  Dr. Abercrombie adopted Dr. Toner's recommendation that Thong restrict the use of his upper extremities as far as overhead lifting but rejected Dr. Toner's  finding regarding fine manipulation.  Tr. 180-186.  Dr. Abercrombie completed the RFC assessment form prior to Thong having the EMG.  Like Dr. Toner, Dr. Abercrombie did not have the benefit of the  EMG report.  However, Dr. Toner evaluated Thong and took a history and performed a thorough examination. The ALJ does not even mention Dr. Abercrombie's Physical RFC assessment in his decision.

"'It is well settled that administrative agencies must give reasons for their decisions.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)(quoting *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988).  The ALJ is required to consider carefully all relevant evidence and to link his findings to specific evidence.  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  The ALJ "may not ignore evidence that does not support his decision, especially when the evidence is significantly probative."  *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001), and may not substitute his lay opinion for a medical opinion.  *See Sisco,*, 10 F.3d at 744. Finally, the ALJ may not pick and choose particular entries in a medical record to support his

ruling, he must consider the record as a whole.  *See Schwarz v. Barnhart,* No. 02-6158, 2003 WL

21662103, at *5 (10th Cir. July 16, 2003)(citing *Switzer v. Heckler,* 742  F.2d 382, 385-86 (7th

Cir. 1984).  In this case, the ALJ gave no explanation for rejecting Dr. Toner's opinion that

Thong be restricted from overhead reaching and completely ignored Dr. Abercrombie's Physical

RFC assessment.  This was error.

## C.  Credibility Determination

In his decision, the ALJ concluded Thong "was not a fully credible witness and his

statements regarding the functional effects of his condition [were] not fully accurate."  Tr. 20.  In

support of this finding, the ALJ stated:

> In determining the credit to be afforded the claimant's testimony regarding the functional
> effects of his condition, my consideration has included, but is not limited to his manner
> while testifying at the hearing, the consistency of his testimony with statements on other
> occasions in the record, as well as the claimant's interest, or bias, or prejudice considered
> in light of all the evidence in this case.  Thus, for these reasons, and the particular reasons
> set forth below, I have not fully accepted as credible the allegations of functionally limiting
> symptoms and have afforded the claimant's statements regarding the functional effect of
> his combined impairments limited weight.
>
> First, the claimant alleges he requires the use of at least one crutch to ambulate.  As
> outlined above, I have been unable to locate in the medical evidence of record any
> corroboration by his treating sources of his need for use of an assistive device to ambulate.
> If such assistance were required, it would have been prominently documented in the
> medical evidence of record.

Tr. 20-21.

Credibility determinations are peculiarly the province of the finder of fact and will not be

upset when supported by substantial evidence.  *Diaz v. Secretary of Health & Human Servs.*, 898

F.2d 774, 777 (10th Cir. 1990).  However, "[f]indings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

16

*Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  "Standard boilerplate language will not suffice."  *Briggs ex rel. Briggs*, 248 F.3d at 1239.

The only reason the ALJ gave for finding Thong not credible was his claim that he required the use of at least one crutch to ambulate.  The rest of the ALJ's explanation for finding Thong not credible is boilerplate language.   The medical record is clear that Thong had problems with his stump for extended periods of time and required the use of crutches.  None of Thong's health care providers questioned his credibility.  Therefore, the Court finds the ALJ's credibility determination is not supported by substantial evidence.

**D.  Vocational Expert Testimony**

At the administrative hearing, the vocational expert (VE) testified that, if Dr. Toner's restrictions were adopted by the ALJ, Thong could not perform his past relevant work, and all other jobs would be eliminated.  Tr. 70-71.  Additionally, Thong contends that even, if he is limited to sedentary work, he is disabled as of June 12 1999.  Under the regulations, a finding of 'disabled' is warranted for individuals age 45-49 who:

    (i)      Are restricted to sedentary work,

    (ii)     Are unskilled or have no transferable skills,

    (iii)    Have no past relevant work, or can no longer perform past relevant work, and

    (iv)    Are unable to communicate in English, or are able to speak and understand
              English but are unable to read or write in English.

20 C.F.R. pt. 404, subpt. P, app. 2 § 201.00 (h)(1).  Thong is 49 years old and can no longer perform his past relevant work, which was unskilled.  In his decision, the ALJ found Thong "cannot read, write or understand the English language. The claimant's education is 'unable to

17

communicate in English' by regulatory definition."  Tr. 22.   Additionally, Rule 201.17, dictates a finding of "disabled" in this case.  Under Rule 201.17, an individual between the ages of 45-49, who is illiterate or unable to communicate in English, and whose previous work experience was unskilled is considered disabled.  *See id.* Rule 201.17.  In this case, the ALJ also found Thong was "functionally illiterate."  Tr. 59.

## Conclusion

The Commissioner failed to meet his burden and erroneously rejected the agency's own consultants' findings and recommendations.  The VE testified Thong could not perform his past relevant work and all other jobs would be eliminated if Dr. Toner's restrictions were adopted by the ALJ.  Moreover, the record fully supports a determination that Thong is disabled as a matter of law and is entitled to benefits.  Accordingly, the Court finds the ALJ's finding that Thong is not disabled is not supported by substantial evidence and is contrary to law.  Because "[f]urther administrative proceedings would only further delay the appropriate determination and award of benefits," *see Dixon v. Heckler*, 811 F.2d 506, 511 (10th Cir. 1987), the case is remanded for the immediate calculation and award of benefits commencing on January 31, 1997.

A judgment in accordance with this Memorandum Opinion will be entered.


_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**